We'll move to the next case, Agedath Israel v. Cuomo. Thank you, Your Honor. This is Avi Schick for Appellants. I've served one minute for rebuttal. Thank you. May it please the Court, Executive Order 202.68 contains multiple restrictions limiting attendance at houses of worship. In red zones, attendance is restricted to the lesser of 10 people or 25% of legal capacity. In orange zones, attendance is restricted to the lesser of 25 people or 33% of capacity. The Supreme Court granted the application to enjoin the 10 and 25-person limits pending appeal. Defendants now consent to an injunction against those restrictions. What remains at issue in this appeal are the red zones' 25% capacity restrictions and the 33% limitations in orange zones. The analytical framework of the Supreme Court's decision drives the analysis of those restrictions and compels the conclusion that they violate the Free Exercise Clause. This is so for two independent reasons. First, the order impermissibly targeted the Orthodox Jewish community. That is evidenced by defendants' numerous statements singling out that community and its institutions. Just the day before issuing the order, defendants threatened to close those institutions down. And the discretionary process of zone designations was used by the governor to target the Orthodox community. Other areas with higher positivity rates were subject to fewer restrictions and no other neighborhood has been designated a red zone despite higher positivity rates. Second, the order's disparate treatment of religion and non-religious conduct violates the Free Exercise Clause. Under the Executive Order, offices are permitted to operate at 50% capacity even in red zones, while houses of worship are restricted to 25%. Essential gatherings are permitted with no restrictions at all. This disparate treatment of religious conduct exists in orange zones as well, with attendance limited to 33% of capacity while offices and others deemed essential can have 50%. For all of these reasons, as explained by the Second Circuit, the order is subject to strict scrutiny, a standard that even a defendant does not contend he can satisfy. Significantly, if the order's restrictions on houses of worship are preliminarily enjoined, other attendance restrictions will still remain in place. The state is governed by its Phase 4 reopening plan. Under that plan, attendance at houses of worship is restricted to 25%. Can I ask you to address the state's argument that the occupancy limits are highly dependent on the nature of the building because it's calculated based on usable space, not square footage? Because I understand that argument. It essentially amounts to the proposition that occupancy caps that might appear discriminatory on their face because they're operating against the backdrop of other disparities are actually less stringent as compared to the 50% occupancy rate. Your Honor, before the district court, we had a hearing at which all parties, including defendant, were asked if they want to put on witnesses. Defendant declined. Defendant did, however, put in a very comprehensive affidavit from the health department explaining the executive order. That affidavit was signed by the health commissioner. It contains 99 separate paragraphs and 32 different exhibits. In none of those paragraphs or none of those exhibits, in none of the briefs before the opposition, before this court, did the state ever even suggest that its limitations had anything to do with those limits in the building code. It was raised the first time on this appeal, not in any of the briefings of the district court, not in any of the briefings before this court on the injunction pending appeal, not before the Supreme Court. As I said, not in the health commissioner's 99-paragraph, 32-exhibit declaration explaining precisely the reasoning and justification for it. So there's no evidence in the record to support it, and there's nothing to suggest it had anything to do with the limitations on appeal here. Mr. Schick, this is Judge Park. The last time you were here, you said that you weren't challenging the percentage capacity limits. We were just looking at the 10- and 25-person caps. So haven't you disclaimed that argument now, and isn't it improper for you to be going back to that now that you've got a favorable Supreme Court decision? Not at all, Your Honor. We're here today on the appeal of the denial of plenary injunction. There's no dispute that our motion for plenary injunction sought to enjoin both the 10- and 25-person restrictions and the 25- and 33-percent restrictions. Well, but you told Judge Lohier at the last time that you were not objecting to the 25-percent limitation, didn't you? I think, more precisely, the judge asked me, could we live with that? In other words, we were talking at the end of an argument. I think the diocese had suggested it would be okay with an order to that effect, and then Judge Lohier asked me what I would be okay with. But in any event, there's no reason to suggest, there's no argument, that that discussion on an injunction pending appeal somehow limits our right to pursue our appeal of the denial of plenary injunction, which there's no question sought the very relief we're seeking here. Okay, and can I also ask you a question about your allegations about zoning? If we agreed with you on that point, wouldn't the relief that you're seeking be the same? In other words, the injunction on the caps, whether it's 10-25 or the 25-percent, set that aside, it goes to the same relief, right? I'm not sure I understand the question. Yes, we're seeking an injunction against... The executive order, when it describes the red zones and the orange zones, says in red zones, houses of worship are limited to the lesser of 10 people or 25 percent, and in orange zones, the lesser of 25 people or 33 percent. What we're seeking to enjoin are those two sets of restrictions, the 10-25 and the 25-person and 33 percent. Right, yeah, maybe I'm not being clear in my question. Whether the zoning was impermissible gerrymandering or whether it's discrimination against a religious exercise on its face, you get to the same place, right? Those are two different avenues of making your same point and seeking the same relief. Am I understanding that right? Absolutely. Absolutely. Okay, thanks. So the government says that there's no evidence in the record that the percentage limitations impose a substantial burden on your client's exercise of religion. Is that right? There's nothing in the record that shows that? That's not right, Your Honor. I think they said when we were before the district court, we were indiscriminately challenging the totality, the entirety of the restrictions, and we explicitly said that those restrictions impose an impermissible burden on the congregants of those synagogues who would not be able to pray given the capacity restrictions that were being imposed. Okay. If I can just conclude, the defendant seeks to avoid this court's decision by suggesting a remand to the district court, but the Supreme Court's order in this case explicitly contemplates that this court will decide this expedited appeal. The governor has determined that 50% capacity is appropriate. This court should issue a preliminary injunction now because the executive order is facially discriminatory. As the Supreme Court held, more than two months of irreparable injury is too much. This court should therefore reverse the denial of the preliminary injunction and direct the district court to enjoin the order's restrictions on worship. Thank you, Mr. Schick. Mr. Mastro? Yes, Your Honor. Randy Mastro, Gibson Dunn on behalf of Appellant Plaintiff Diocese of Brooklyn. Your Honors, I think our argument is much simpler and narrower now in light of the Supreme Court's ruling on the writ of injunction. We are seeking on this appeal, and we have been seeking in the lower court, only a preliminary injunction on the fixed capacity restrictions in the governor's executive order on houses of worship, limiting them to 10 people in red zones and 25 people in orange zones. We are prepared to abide by, and in fact have been abiding by, the percentage capacity caps imposed by Executive Order 20268 in red, orange, and yellow zones. So we take no position on this appeal, a preliminary injunction denial on that issue. But the Supreme Court's ruling, I think, has made clear that a majority of the court has enjoined the fixed capacity restrictions and the governor has now conceded on this appeal that he, quote, withdraws his objection to the preliminary injunction that the diocese requests and does not object to an order from this court either issuing or directing the issuance of the preliminary injunction that the diocese seeks. And that's the appellant's brief on pages one and two. And the only other thing that I would add at this point, Your Honors, is that to the extent the governor continues to question whether strict scrutiny should apply to those fixed capacity restrictions, I think the Supreme Court, as well as Judge Park in dissent on this court, whose opinion was largely adopted by the majority of the Supreme Court, that clearly strict scrutiny applies under these circumstances to this executive order. Well, I know you take no percentage on the capacity, you take no position on the capacity, sorry, excuse me, you take no position on the percentage capacity restrictions, but if the Supreme Court's position was strict scrutiny applies to the fixed capacity limitations, is there really an argument for applying a different level of scrutiny to the percentage capacity restrictions? Did you hear that, Your Honor? Yes. Your Honor is right to ask the question. Strict scrutiny applies, and I think the Supreme Court majority has made very clear that strict scrutiny should apply. That certainly brings into question even the percentage capacity restrictions, but that is not our appeal. That is not why we are here. We are in fact imposing on ourselves, the diocese has an unblemished safety record, exemplary according to the lower court. We had hearings and witnesses who testified for the diocese and the state, that it is imposing on itself standards on percentage capacity as strict or stricter than the governor has required, and we are telling this court now that we are prepared to abide by the percentage capacity restrictions and the governor's executive order, even if this court would define favor unconstitutional, because we do that as a matter of safety in our churches, because we are so committed not only to the free exercise of religion, but the safe practice in our houses of worship. This is Judge Park. I have a question about mootness. The governor said that this, I think after the Supreme Court's decision, the governor said that this issue is moot because there aren't any more churches in the red or orange zones, and I guess I'm just wondering, is that right as a factual matter? Is there anything that you're actually fighting over in terms of the application of the executive order? Thank you for asking that, Judge, because of course it is not right and the Supreme Court rejected it. The governor did that, literally took the zones of Brooklyn out of orange into yellow, even though statistically by the standards that the state said it was applying on the positivity rate, it still qualified as an orange zone. It was done literally on the same day that the application for a rift in the Supreme Court was fully submitted and about to be decided by the Supreme Court, which it did days later. So the Supreme Court majority thought for what it was, an attempt to evade appellate review and also saw that, of course, this is an issue capable of repetition. The governor could simply have amended his executive order, taken out the fixed capacity restrictions and eliminated the issue. The governor didn't do that. The governor continues to adhere to that executive order, and there are other parts of the state that have been orange or red zones or continue to be orange zones. And we hear every day about, you know, the potential and changes in how zones are treated within the city. So of course this issue is still rightful review. Of course the Supreme Court saw the governor's actions for what they were, an attempt to evade review. And of course the Supreme Court was right to decide the writ of injunction and this court is right to enter a preliminary injunction consistent with that, which the governor conceives and has no objection to you entering. Thank you. We'll hear from New York. Thank you, Your Honor. May it please the court, we do not object to either plaintiff's request for a preliminary injunction on the 10- and 25-person limits, but as to Agudat's challenge to the percentage limits, the denial of its targeting claim should be affirmed because the district court did not clearly err in finding that the purpose of the order is to limit mass gatherings in COVID hotspots, not to target Orthodox Judaism. Additionally, the denial of Agudat's disfavored treatment claim should be vacated and remanded so that the district court, proceeding in an expeditious manner, can address in the first instance the effect of the Supreme Court's decision on the percentage limits standing alone. As to Agudat's targeting claim, the governor's comments do not target Orthodox Judaism. As the district court found, those comments were taken selectively out of context and properly understood, they reflect the goal of limiting mass gatherings in COVID hotspots because of their high virus transmission potential. The order has not been applied to target Orthodox Judaism either. There is no evidence that any geographic area with similar positivity rate and population density, but without a substantial Orthodox Jewish population, has been subject to less restrictive zone designations than the Brooklyn and Queens areas at issue here. Now, as to Agudat's disfavored treatment claim regarding the percentage limits, this court routinely vacates and remands for intervening Supreme Court decisions, as we explained in our recent 28th J letter, and a vacate and remand makes particular sense here because the Agudat synagogues and, for that matter, the diocese churches are larger buildings. Only the fixed number limits were implicated in this case as a factual matter until the Supreme Court ruled and essentially took the fixed number limits off the table in the middle of this P.I. appeal. No party had submitted or had any reason to submit evidence and argument squarely addressing the percentage limits. Well, I'm looking at the Supreme Court's decision and, you know, when it's explaining why there's disfavored treatment, it says, while attendance at houses of worship is limited, when it's talking about Orange Jones, while attendance at houses of worship is limited to 25 persons, even non-essential businesses may decide for themselves how many persons to admit. You could just replace limited to 25 persons with limited to 33 percent, or sorry, 25 percent, and the same logic would apply, right? I mean, there is just a difference between the two comparators the Supreme Court thought were relevant. No, Your Honor. In respect to the percentage limitations. Your Honor, that's not right, and here's why. You are right to say that the Supreme Court focused on the very wide delta between small fixed number limits on houses of worship and supposedly unlimited essential businesses and certain non-essential businesses. But on the one hand, the percent limits are less restrictive than fixed number limits and scale with the size of the building. And on the other hand, as Agudas concedes on page three of its reply brief, the Supreme Court failed to appreciate that essential businesses have limits, too. In fact, the essential businesses that the Supreme Court focused on, retail businesses, office-based businesses, and manufacturing businesses, all have a 50 percent limit. And because of the way maximum occupancy is calculated, this is one of the issues we would love to explore in the district court, because of the way maximum occupancy is calculated in total number of people terms, houses of worship may in fact be treated more favorably than the essential businesses that the Supreme Court focused on. I guess I have two questions about that. So even though you're right that the businesses are subject to this 50 percent limit, that's still higher than the limits to which the houses of worship are subject, right? It's higher in terms of numbers, but as I was just discussing with Your Honor, it may not be higher. You're saying the occupancy limitations might make it different, or the way occupancy is calculated. So Agudas Israel points out that everybody is subject to social distancing requirements, and so regardless of how the occupancy limitations are calculated, everybody needs to be spaced out in the same way. And so the state can't say that only allowing a certain number of people in makes a difference, because all of the spacing will be the same. Why isn't that correct? That's just incorrect algebraically, especially for the larger buildings at issue here, like the Agudas Synagogue. For larger buildings, it may well be the case that the prescribed percent of maximum occupancy can fit comfortably within the building and accommodate the six-foot or 12-foot, in certain cases, social distancing protocols, such that those social distancing protocols would not operate to displace further people out of the structure and equalize the limits across different structures. And this sort of structure-by-structure comparison, the mathematical effect in certain cases of these protocols, is exactly one of the issues that would be ripe for exploration in the district court, namely how mathematical... This was not a rationale that was given in real time, right? There's nothing in the record that reflects that this was part of how the numbers were arrived at. And so you can't really show narrow-tailing through a post hoc explanation, can you? No, we can't show it through a post hoc explanation. We want to show it through just a regular old hoc explanation. We want to go back to the district court and make this showing, because no one had ever focused on these limits before. I mean, it appears to be a reason that you are coming up with in litigation, as opposed to a rationale that's offered as a justification for the order in the first place. That's what I mean by post hoc, in terms of the timing. Well, Your Honor, in the 24 hours that this litigation was put together in the district court, neither of the parties, both challenging or defending the executive order, really sought any reason to address the percent capacity limit standing alone, because as a factual matter, only the fixed number limits applied. Because, remember, this was a lesser of scenario, and because Agudat synagogues are on the larger side, only the fixed number limits applied. Can I just ask, let's assume for the moment that if this went back down, you could establish everything that you've articulated today, that once you take into account the maximum occupancy usable space, that the churches and synagogues are actually treated more favorably. Haven't we met the strict scrutiny trigger already, by virtue of the absolute limits that are included in this executive order? So your job on remand would be to satisfy strict scrutiny that this is an appropriate, nearly tailored approach. Well, that's not how we view it, Your Honor, because as I was discussing with Your Honors earlier, we concede as to the fixed number limits. Those are, for preliminary injunction purposes, effectively off the table. So what we are talking about now is the percentage limit standing alone. And we have arguments and evidence to submit. We have things to say about, A, what level of scrutiny applies, in terms of whether those percent limits actually offer disfavored treatment or not, and then, B, if indeed strict scrutiny is found to be the applicable level of scrutiny, whether that level of scrutiny is satisfied. And indeed, Judge Park in his... So your position is that the numerical limitations might very well amount to disfavored treatment because they're lower, but the percentage limitations might not be, even though there are different percentages that are applied, and therefore it's a totally different question. That's your position? It may be. It appears to be a totally different question. Again, I would love the ability to explore this. So part of the reason why you think it might not be disfavored treatment is because of these provisions of the building code you cite about how occupancy limits are calculated. I looked at the building codes, and the provisions there are tied to the type of seating that different gatherings have, whether it's movable seating or it's fixed pews and so on. The building code doesn't define occupancy limitations by the religious status of the gathering or the building, and yet the executive order does. So isn't it a problem for your argument that the provisions of the building code you're pointing to are religiously neutral, but the executive order seeks to take those into account by targeting only religious institutions? Your Honor, that may well go to the scope of this argument about the real impact of the percentage limits. It's one of the many things that would benefit from further evidence and argument now that the parties are for the first time in this litigation. The issue wasn't really joined until the reply brief in this court. But why isn't it enough just to see that it's not neutral toward religion because it's targeting religious institutions to trigger scrutiny? Well, with respect to the percentage limits, we don't know. We tried to preview in our brief some of the evidence as to why in real number-of-person terms religious institutions are treated more favorably under the percentage limits. But I agree that there are wrinkles to this argument that would need to be smoothed out. We are not saying that we win here today on this argument. We are saying, let us go to the district court in an expeditious manner. The district court has shown that it can handle this case in an expeditious manner and make some evidence and argument. So whatever decision is made on this issue, it can withstand as much review as the parties wish to give it. Since we're still reviewing the denial of preliminary injunction, why isn't that an issue to be decided after an injunction is issued and then it goes back to the trial court for determination on the merit? Well, I see what you're getting at, Your Honor. I think even if, though, one were to say that looking at the building code, even in a prima facie way, you don't find it persuasive. Still, we need the opportunity to submit evidence and argument concerning whether the percentage limits satisfy strict scrutiny. People were largely focused on what level of scrutiny applies. But, and again, this could also be the subject of testimony regarding why percentage occupancy limits are calculated the way they are and whether limits that scale proportionally with maximum occupancy are, from an epidemiological perspective, the least restrictive COVID safety alternative, as in fact the Supreme Court, in its opinion, suggested they might be. So you said a moment ago that the governor's statements were really about reducing mass gatherings. When the governor said it's an ultra-Orthodox Jewish problem, was that about gatherings in general? All those statements, as the district court found, and the finding was not clearly erroneous, were taken out of context. For example, in the... I guess I'm just asking you to provide the context. Yes, I would love to. I believe Your Honor is speaking about the October 5th press conference in which the governor also talked about closing institutions down. Judge Park focused on that as well in his motion dissent. The governor also said in the full transcript of that press conference that he either would close down or has closed down many venues conducive to mass gatherings, namely colleges, K-12 schools, and 20 zip codes, parades, and bars and restaurants not obeying DOH guidance. And I think some of the most probative statements when we're talking about the governor's comments are the comments that the other side doesn't cite you to and I think are the most probative, which is the October 6th statement contemporaneous with the rollout of the executive order where the governor makes clear it's about mass gatherings. And then he cites many examples, some secular, some non-secular, about mass gatherings that make clear that his focus is mass gatherings. But you're just saying he made later statements that are not consistent with the initial statement that it's about the ultra-Orthodox Jewish community, but that statement itself was saying, I have an issue with a particular religious community, wasn't it? No, he's not saying he has an issue with a particular religious community, at least as I understand your question. He's saying he has an issue with coronavirus clusters and mass gatherings happening in hotspot areas, and it so happens as a factual matter that some of these hotspot areas have been linked to mass gatherings of an Orthodox Jewish religious group. This is Judge Park. Could I just ask one clarification question? Your brief says that the governor withdraws his objection to the injunction on the 10-25 person cap. I'm just wondering, what is your position as to whether those numerical caps are subject? Are they subject to strict scrutiny or not? Do you concede that they are? For preliminary injunction purposes, yes. I think we would have to concede that. There's still an underlying permanent injunction proceeding in this case, and I think we would want to reserve our ability to really firm up, among other things, our epidemiological record as to what's comparable and what's not and show that there was no disfavored treatment in the first place. But we do not object to a strict scrutiny treatment for purposes of this PI. That's correct. I don't understand that. What would be the difference in terms of the posture as to whether strict scrutiny or rational basis review applies? The difference, Your Honor, between the preliminary injunction and the permanent injunction? Right. The distinction you're making. Yeah, the distinction I'm making is what we would concede for purposes of this appeal, which is about a preliminary injunction and the rights we'd like to reserve and the arguments we may still make in the underlying permanent injunction proceedings. The Supreme Court, in its decision, at least as we read it, didn't make clear whether we erred conceptually in focusing on only those secular activities that present a comparable COVID risk or whether we erred factually in just not providing a robust enough record as to what counts as comparable. And that record that we provide to the Supreme Court is essentially the same record that's before Your Honors now on this PI appeal. But we would go back to the well and try to firm up that record such that we might be able to show, among other things, that even as to the fixed number limits, when you make an apples-to-apples comparison in terms of activities and businesses with comparable COVID epidemiological risk, that there is no disfavored treatment in the first place and therefore that rational basis review would apply. But I just want to circle back that for the purposes of this appeal, we are conceding an injunction and we realize that the record on this appeal is not persuasive enough to take the limits out of the strict scrutiny box, the fixed number limits. Thanks. Can I just ask one other clarification question? I think in Agada's brief, they say at one point that in the yellow zone, schools and institutions of higher education can remain open at full capacity. Is that correct? There are not similar capacity restrictions on schools. There are very rigorous and much more rigorous COVID testing requirements. A certain percentage of the school has to be tested sort of on a rolling basis. And if the positivity rate ever exceeds a certain threshold, and I believe it's different in different localities based upon population density, then the whole school has to close down. And there's no similar testing regime imposed by the guidance, public guidance on religious services. And schools include universities? There is separate guidance on higher education. I believe there's some overlap with respect to the protocols, but I can't pinpoint at the moment exactly what the differences are. All right. If I need further clarification, we'll send out an order to that effect. If I could have a moment to close. I'm sorry, I didn't know the question. Yes. Your Honors, we are in a COVID resurgence, and Governor Cuomo is trying his level best to protect all New Yorkers, including plaintiffs and their worshipers, from the dangers of mass gatherings in COVID hotspots. That is the purpose behind the executive order. We accept a preliminary injunction on the 10- and 25-person limits, but we ask the court to let us return expeditiously to the district court to demonstrate that a preliminary injunction is not warranted on the percentage limits standing alone. Thank you. Thank you. We'll hear rebuttal. Thank you, Your Honor. Abishek, on behalf of the Palm Temple of Israel. Your Honor, we do not have any issue with the state trying to develop this POTOC argument of building codes and whatnot. As was pointed out in the questioning, we are here on an appeal of a P.I. The preliminary injunction should issue, after which the case does, in fact, go back down to the district court where they can develop a record and argue the merits and have a trial on the issue of a permanent injunction. But there's nothing in this record to suggest that the reasons they are putting forward now should prevent the issuance of that preliminary injunction that's requested. Second, I just want to reiterate what Counsel for Diocese said. This case is certainly not moved to the Supreme Court. Address that argument that was put forward by the defendant before the Supreme Court. While the diocese churches are in Brooklyn and Queens and the named particular synagogues in our case are in Brooklyn and Queens, the Good Official of America, the lead plaintiff, is an umbrella organization with dozens of synagogues throughout the state. And certainly we should get to a decision here on this preliminary injunction. And just finally to... Real quick, can I ask, if the 25% percentage limit isn't joined, what's the restriction? Is it 33, 50, 100? Where does that leave you? Oh, sure. Thank you, Rana, for allowing me to address that. There's two answers. It's 50% is the default. And that's because the Phase 4 reopening plan of the state governs and it has a 50% limit. The state conceived that at page 27 of its opposition brief footnote 12, and we discussed it at page 5 of our reply brief. In addition to the strict 50% limitation in the Phase 4 reopening plan that would govern houses of worship, there is also, as has been discussed, the general social distancing and masking requirements that would be imposed and complied with. And so if those would, for whatever reason, impose a further limitation, then that's what governs. But the default is 50%. It doesn't go to zero. There's no universe in which an injunction here says that there are no restrictions on houses of worship. All it does is it goes back to the default, which puts houses of worship, religious conduct, exactly on equal footing with offices, retail stores, and other secular activity. Can I ask you just to respond quickly to what the government said about the governor's statements about Orthodox Jews, that he wasn't really saying there's a special problem with Orthodox Jews, but was saying that he's concerned about all gatherings. A couple of responses to that, Your Honor, which we cover at pages 10 to 12 or 13 of our reply brief. But as we note in our complaint here, and as the photograph in the complaint demonstrates, the governor actually held up a picture of an Orthodox Jewish event to demonstrate the conduct that he was trying to restrict. In fact, he was holding up a picture of a 2006 event. And so it was certainly inappropriate for multiple reasons. But there can be no universe in which he can explain the statement that, quote, this is a predominantly an ultra-Orthodox cluster. The governor made that statement on October 9th, three days after his first statements on this issue, three days after the executive order was issued, a day after he filed that complaint, and three hours before the TRO hearing. So it was discussed at the TRO hearing. He went to CNN to say that, quote, the cluster is a predominantly an ultra-Orthodox cluster. There are numerous other statements he made. What he says, again, on page 11 of our reply brief, this is a quote, the micro-cluster we're focusing on is the ultra-Orthodox communities. He also said, quote, he has to impose harsh restrictions on, quote, these ultra-Orthodox communities who are also very politically powerful, close quote. So there are just a raft of statements over a period of time which make it indisputably clear that this is what he was targeting. In fact, just comedy in the Eastern District, who heard the TRO application of diocese, said in his decision that the governor made it remarkably clear that he was targeting the ultra-Orthodox community. There's just no other way to look at the, you know, long series of comments preceding the order, simultaneously the order, subsequent to the order, all of which focused ultra-Orthodox, ultra-Orthodox, ultra-Orthodox. There's no other religious group mentioned. Clearly, it's about religious institutions. They've now walked that back, as we saw on page 21 of our reply brief, where they have a chart where religious institutions make up a miniscule portion of where they say COVID transmission is. But at the time, they were, and this is the problem. What happens if you target a religious minority? There's something that's going on in the world. There's this fear. There's a disease. And literally, this community was targeted by the governor, not as victims of this virus, but as perpetrators of it. That's improper. And just the last point, Judge Varnaschi, you asked earlier in my argument about a state's assertion that we didn't put in evidence on the percentage of limitations. We addressed that at page 22 and 23 of our reply brief, both, as I said, with the specific statements we made addressing it and the waiver argument that the state has waived that. I just wanted to circle back on that. With that... Thank you, Mr. Schiff. Thank you. Mr. Mastro? Thank you, Your Honor. I'll be very brief. I just wanted to point out, because I listened to the argument made by the state and how things could change, you know, a remand for full record on the merits. We did have an evidentiary hearing. The state did have a chance to call witnesses. And the decision is ultimately framed by the Supreme Court in its majority or per curiam opinion, was not comparing a house of worship to a particular essential business or whether a house of worship was treated, you know, better than some businesses and worse than others. It was the concept conveyed in that majority opinion that the governor's restrictions on house of worship, the restrictions aren't neutral. There are special restrictions on houses of worship. And the 10 and 25 fixed person capacity limits are unique to houses of worship compared to so many other businesses and harsher than so many other businesses. So I just wanted to suggest that I can't foresee any circumstance where the state made its record, we made our record, that things are going to change as to the fixed capacity restrictions as applied to houses of worship. And that's the only issue that the diocese is here on today. We therefore respectfully ask the courts to order a permanent injunction to be entered here or by the district court, barring the governor from enforcing the fixed capacity restrictions of 10 persons in a red zone and 25 persons in an orange zone. There's obviously 10 persons in a house of worship. One of our churches normally has a capacity of over 1,000 people. Strict scrutiny applies and there's no narrow tailoring there. It doesn't work. Thank you, Your Honors. Thank you all. Very well argued. And we'll take the matter under advisement. That's the final case on the calendar for this morning, so I will ask the clerk to adjourn court. Court stands adjourned. Thank you. We're sorry. Your conference is ending now. Please hang up.